UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| BRIAN MILLER, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 3:17-cv-00004 |
| Plaintiff, | § § | |
| v. | § § | JURY TRIAL DEMAND |
| PAUL L. FOSTER, SIGMUND L. CORNELIUS, L. FREDERICK FRANCIS, ROBERT J. HASSLER, BRIAN J. HOGAN, JEFF A. STEVENS, SCOTT D. WEAVER, and WESTERN REFINING, INC., | § § § § § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

Plaintiff Brian Miller ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1.     This is a stockholder class action brought by Plaintiff on behalf of himself and the other public stockholders of Western Refining, Inc. ("Western" or the "Company"), other than Defendants (defined below) and their affiliates, against the Company and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules and Regulations promulgated thereunder, including Rule 14a-9, in connection with the proposed merger between Western and Tesoro Corporation ("Tesoro") pursuant to the November 16, 2016 Agreement and Plan of Merger (the "Merger Agreement"), through Tesoro's newly formed wholly owned

Delaware corporation, Tahoe Merger Sub 1, Inc. ("Merger Sub 1") and Tesoro's newly formed wholly owned Delaware limited liability company, Tahoe Merger Sub 2, LLC ("Merger Sub 2") (collectively, the "Merger Subs"). Under the Merger Agreement's terms, Merger Sub 1 will merge with and into Western, with Western surviving the merger as a wholly owned subsidiary of Tesoro, Western will then be merged with and into Merger Sub 2, with Merger Sub 2 surviving as a wholly owned subsidiary of Tesoro (the "Proposed Transaction").

2.      Pursuant to the terms of the Merger Agreement, Western stockholders will receive $37.30 per share of Western stock (the "Merger Consideration").  Western shareholders will have the option to either receive 0.4350 shares of Tesoro or cash for each share of Western stock. Elections to receive cash will be subject to proration to the extent they exceed approximately 10.8 million shares (or approximately $404 million in the aggregate).  Stock elections will not be subject to proration.  This Merger Consideration is inadequate and undervalues the Company. More specifically, the Merger Consideration represents a 24.4 percent discount over Western's 52-Week high of $46.65 per share.

3.      Unsurprisingly, in the light of this low Merger Consideration, the Proposed Transaction is marred by a flawed process and conflicts of interests, not the least of which is that some of the directors will receive windfall profits from the accelerated vesting of certain equity awards.  In addition, certain members of the Board and management secured for themselves lucrative continuing employment with the surviving company. Two of Western's main negotiators, Foster, Western's Executive Chairman, and Stevens, Western's current Chief Executive Officer ("CEO") will become directors of Tesoro.   In addition, the Company's financial advisor, Barclays was conflicted throughout the process that resulted in the Merger

Agreement, having earned millions in fees from Western in the years preceding the Merger Agreement.

4.      In order to convince Western's stockholders to vote in favor of this flawed transaction, the Board authorized the filing of a materially false and/or misleading S-4 Registration Statement with the Securities and Exchange Commission ("SEC") on December 14, 2016 (the "Proxy").  The Proxy recommends and solicits Western stockholders to vote in favor of the Proposed Transaction and exchange their shares pursuant to the terms of the Merger Agreement, based among other things on misleading and omitted information that was relied on by the Board and the opinion of Barclays that were rendered to the Board in Barclays fairness opinion.  The Proxy is false and/or misleading due to the omission of material information concerning the following: (i) the Board's determination that no other alternative transaction would be available; (ii) projections produced by Western management and used by Barclays, in support of their analyses; and (iii) the financial analysis performed by Barclays.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Western Refining and the Board for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78n(a), 78t(a), and SEC Rules G and 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Western stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Sections 13(e), 14(a) and 20(a) of the Exchange Act and SEC Rules 14a-9 and 13e-3.

7.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for the Delaware state law claim of breach of fiduciary duties.

8.     Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Western Refining maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

10.     Plaintiff was, and has been at all relevant times, the owner of Western Refining common shares.  Plaintiff held his Western Refining shares prior to the wrongs complained of herein.  Plaintiff is a resident of New York.

11.     Defendant Western Refining, Inc. is a Delaware corporation that is headquartered in El Paso, Texas.  Western is an independent refining and marketing company.  The retail segment includes retail service stations and convenience stores in Arizona, Colorado, Minnesota,

New Mexico, Texas, and Wisconsin.  The company trades on the New York Stock Exchange under the symbol "WNR".

12.     Defendant Paul L. Foster ("Foster") is and at all material times was the Chairman of the Company's board of directors.

13.     Defendant Sigmund L. Cornelius ("Cornelius") is a member of the Company's board.

14.     Defendant L. Frederick Francis ("Francis") is a member of the Company's board.

15.     Defendant Robert J. Hassler ("Hassler") is a member of the Company's board.

16.     Defendant Brian J. Hogan ("Hogan") is a member of the Company's board.

17.     Defendant Jeff A. Stevens ("Stevens") is the Chief Executive Officer of Western Refining and a member of the Company's board.

18.     Defendant Scott D. Weaver ("Weaver") is the Vice-President, Assistant Treasurer and Assistant Secretary of Western Refining and a member of the Company's board.

19.     Non-Party Tesoro Corporation ("Tesoro") is a Delaware corporation that is headquartered in San Antonio, Texas.  Tesoro is an independent refiner and marketer of petroleum products.  Tesoro is a Fortune 100 company that trades on the New York Stock Exchange under the symbol "TSO".

20.     Non-Party Tahoe Merger Sub 1, Inc. ("Merger Sub 1") is a Delaware corporation and a wholly owned subsidiary of Tesoro.  Merger Sub 1 was formed for the sole purpose of effecting the Proposed Transaction.

21.     Non-Party Tahoe Merger Sub 2, LLC ("Merger Sub 2") is a Delaware limited liability company and wholly owned subsidiary of Tesoro.

22.     Defendants identified in paragraphs 12-18 are collectively referred to as the "Individual Defendants."

23.     Defendants referred to in paragraphs 11-18 are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

25.     This action is properly maintainable as a class action for the following reasons:

26.     The Class is so numerous that joinder of all members is impracticable.  As of October 28, 2016, there were over 108 million outstanding Western shares.  The holders of these shares are believed to be geographically dispersed through the United States;

27.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Registration Statement in violation of Section 14(a) of the Exchange Act and SEC Rules and Regulations including Rule 14a-9; (ii) whether the Director Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their  shares regarding the Proposed Transaction based on the false and/or misleading Registration Statement.

28.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

29.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

30.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

31.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

32.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of the Companies

33.     Western is a Delaware corporation that has been publicly traded since January 2006.  Western is an independent oil refiner and marketer operating mostly in the southwestern, western and upper Midwest of the United States.  Western is the owner operator of three oil refineries with the capacity to produce 246,000 barrels per day of high-value light products such as gasoline, diesel, and jet fuel.

34.     Tesoro is a Delaware corporation founded in 1968.  Tesoro, a Fortune 100 company, is an independent refiner and marketer of petroleum products operating mostly in the western United States.  Tesoro is the owner operator of seven refineries with the capacity to produce 895,000 barrels per day of refined oil products.

**B.**   **The Conflicted and Inadequate Sale Process**

35.     In June 2016, Western completed the acquisition of Northern Tier Energy LP in a deal valued at $ 1.4 billion.  Western had publicly announced that the deal benefitted Western's shareholders by acquiring three of the most profitable refineries, simplifying its corporate structure, and providing access to more capital.  Despite Western's potential for growth post-acquisition of Northern Tier, the Board approved the Proposed Transaction less than five months later and before Western's stockholders could reap any benefits of the Northern Tier acquisition.

36.     As an initial matter, the Board allowed three conflicted Western directors to lead the negotiations on behalf of the Company.  More specifically, Foster and Stevens will become directors of Tesoro upon closing of the Proposed Transaction.  Further, Foster, Stevens, and Weaver have all entered into voting agreements with the Company and Tesoro that require them to vote in favor of the Proposed Transaction.  Foster, Stevens, and Weaver collectively own over 22.5% of Western's outstanding stock.  Despite these clear conflicts of interest, the Board allowed Foster, Stevens, and Weaver to lead negotiations with Tesoro.

37.     As revealed in the Proxy, Tesoro initiated discussions with Western regarding a possible acquisition in early September 2016.  After Foster met with Tesoro's Chairman, President, and CEO Gregory J. Goff ("Goff"), Foster informed the Board of Tesoro's interest in acquiring Western, and the Board authorized Foster, Stevens, and Weaver to continue discussions with Tesoro.  The Board also consented to Tesoro's potential engagement of Goldman Sachs in connection with the deal, and authorized Foster, Stevens, and Weaver to initiate discussions with Barclays to assist in evaluating a potential transaction with Tesoro and other strategic alternative options for Western.

38.     On September 30, 2016, Stevens spoke with Barclays regarding Western's possible engagement of Barclays to serve as its financial advisor to assist in evaluating the merits

of a potential strategic transaction with Tesoro and other strategic alternatives.  Barclays began advising Western on these matters despite not being formally engaged until November 11, 2016.

39.     On October 13, 2016, Western's management and Barclays held a teleconference where Barclays provided its preliminary analysis of potential strategic transactions with Tesoro. The parties also discussed potential alternative transactions and speculated that a transaction with Tesoro would likely be the most beneficial.

40.     On November 4, 2016, the Board held a telephonic meeting with Western's senior management, Barclays, and its legal advisor.  Foster provided an update regarding ongoing discussions with Tesoro.  Barclays then reviewed its preliminary analysis of a transaction with Tesoro as well as potential alternatives.  Barclays speculated that a superior alternative transaction was likely.  The Board accepted Barclays' speculative opinion regarding alternative transactions and determined not to seek other potential purchasers.  The Board determined to continue pursuing a strategic transaction only with Tesoro and authorized Foster to make a counter proposal to Tesoro that included a 27.5% premium and that Western be permitted to appoint two directors to Tesoro's board.  Foster provided the counterproposal to Tesoro later that day.

41.     On November 7, 2016, Tesoro requested that Foster, Stevens, and Weaver execute voting and support agreements.  Tesoro also requested that Franklin Mountain Investments LP, an affiliate of Foster, also execute a voting and support agreement.  Ultimately, Tesoro obtained these agreements.

42.     On November 10, 2016, the Board held a telephonic meeting with management, Barclays, and its legal advisor.  Foster updated the Board regarding the ongoing discussions with Tesoro.  The Board also discussed retaining Barclays as its financial advisor and was aware of

certain conflicts with Barclays.  More specifically, Barclays has a $293 million stake in Western.

Further, Barclays earned significant fees as financial advisor to the seller in Western's

acquisition of Northern Tier Energy LLP.  Despite the conflicts with Barclays, the Board

formally engaged Barclays as its financial advisor.

43.     Considering the conflicts of Western's lead negotiators, it comes as no surprise

that Western failed to conduct a pre-signing market check and failed to obtain a post-signing go-

shop period to conduct a market check.  Without any form of market check, the Board was

unable to confirm its, and Barclays', speculative belief that a superior transaction could be

obtained.

44.     On November 16, 2016, the Board met to consider the Proposed Transaction.

Uninformed about potential alternative transactions, the Board unanimously approved the

Proposed Transaction and executed the Merger Agreement.

**C.**     **The Proposed Transaction**

45.     On November 17, 2016, Tesoro and Western issued a press release announcing

the Proposed Transaction, which states in pertinent part:

**TESORO TO ACQUIRE WESTERN REFINING IN $6.4 BILLION
TRANSACTION**

- Transaction creates a premier, highly integrated and geographically
  diversified refining, marketing and logistics company

- Stock transaction at exchange ratio of 0.4350, with option to elect cash in lieu
  of stock up to a cap of 10% of the equity consideration; values the transaction
  at $6.4 billion

- Commit to delivering $350 to $425 million in annual synergies; run rate to be
  achieved within the first two years

- Expects to achieve 10% to 13% EPS accretion in 2018, the first full year of
  combined operations

- Well positioned, highly reliable and advantaged refining system with over 1.1 million barrels per day of refining capacity with access to wide array of advantaged crude oil

- Creates leading multi-brand marketing and convenience store portfolio in growing geographies with over 3,000 combined branded retail stations

- Expands opportunities for logistics growth in crude oil production basins and product regions, particularly in the Permian basin

**SAN ANTONIO AND EL PASO, TEXAS – November 17, 2016** - Tesoro Corporation (NYSE: TSO) ("Tesoro") and Western Refining, Inc. (NYSE: WNR) ("Western") today jointly announced a definitive agreement under which Tesoro will acquire Western at an implied current price of $37.30 per Western share in a stock transaction, representing an equity value of $4.1 billion based on Tesoro's closing stock price of $85.74 on November 16, 2016. This represents an enterprise value of $6.4 billion, including the assumption of approximately $1.7 billion of Western's net debt and the $605 million market value of non-controlling interest in Western Refining Logistics, LP (NYSE: WNRL). This transaction has been unanimously approved by the boards of directors of both companies, and is another transformative step forward for Tesoro and the Company's ongoing commitment to creating significant value for shareholders, employees, communities and other key partners. The acquisition creates a premier, highly integrated and geographically diversified refining, marketing and logistics company and provides a strong platform for earnings growth and cash flow generation.

Under the terms of the agreement, Western shareholders can elect to receive 0.4350 shares of Tesoro for each share of Western stock they own, or $37.30 in cash per share of Western stock. Elections to receive cash will be subject to proration to the extent they exceed approximately 10.8 million shares (or approximately $404 million in the aggregate). Stock elections will not be subject to proration. The purchase price represents a premium of 22.3% to the closing price of Western's stock on the day prior to announcement, and a 31.6% premium to the volume weighted average price over the last 30 trading days. The transaction is expected to be tax-free to Western's shareholders who elect stock.

"The acquisition of Western further strengthens our integrated business model and extends our portfolio into attractive and growing markets," said Greg Goff, Chairman and CEO of Tesoro. "As a leading integrated refining, marketing and logistics company, this transformative acquisition drives value through a combination of access to advantaged crude oil, a strong, multi-brand marketing and convenience store portfolio and a robust platform for logistics growth, all of which will allow us to continue to create shareholder value."

"Also, our increased scale and diversity will enable us to leverage and enhance in-house technical capabilities, which we expect will result in cost efficiencies, the ability to drive more growth and increased productivity," Goff continued.

"This strategic combination provides our shareholders with the opportunity to participate in the tremendous future growth prospects and synergies of the combined company," said Paul Foster, Executive Chairman of Western Refining. "Joining forces with Tesoro, a company that shares our integrated business model strategy, will enable us to further leverage our capabilities in refining, marketing and logistics operations and allow our talented team to work on a growing number of exciting opportunities. We have tremendous respect for the Tesoro team and are excited to be a part of a larger and more diverse organization to support our continued growth."

**Strategic Rationale**

This transaction will enhance the integrated refining, marketing and logistics operations of both companies, creating a combined company that is well-positioned to drive significant growth across the value chain.

- **Top Tier Refining System:** Adds Western's refineries in Texas, New Mexico and Minnesota to Tesoro's existing refineries in California, Washington, Alaska, Utah and North Dakota, which will expand the combined company's operational capabilities and improve access to advantaged crude oil and extended product regions. Combined, the Company will have ten refineries, a refining capacity of over 1.1 million barrels per day and will benefit from Tesoro's and Western's proven track record of operational excellence.

- **Strong, Combined Multi-brand Marketing and Convenience Store Portfolio in Growing Geographies:** Brings together 12 premium and leading value retail and convenience store brands to better serve a broad customer base and regional preferences, and provides improved ratable supply from the entire refining system. The combined retail operations will comprise over 3,000 branded retail stations operating under a variety of brands including ARCO®, Shell®, Exxon®, Mobil®, SuperAmerica®, Giant and Tesoro®.

- **Expands Opportunities for Logistics Growth:** Leverages an extensive and complementary logistics network with access to advantaged crude oil basins. The logistics business will include ownership in two high-growth, independent Master Limited Partnerships – Tesoro Logistics LP and Western Refining Logistics, LP. Upon close of the transaction, Tesoro will own the general partner and be the largest unitholder in each MLP. Tesoro is committed to growing the value of the combined logistics portfolio and the current logistics growth strategy will be deployed across the expanded business. This strategy consists of: generating stable fee-based revenues; optimizing existing assets; pursuing high-return organic growth opportunities; growing through strategic acquisitions; and growing through the combined

drop down inventory available to the two MLPs. Additionally, Tesoro expects to use the parent company's strong operating and execution capability to enhance the portfolio of opportunities in the high-growth Permian and other attractive crude oil basins. This will include investments in crude oil gathering and storage, as well as natural gas gathering and processing.

- **Significant Shareholder Value Creation from Synergies:** Shareholders of both companies will benefit from $350 to $425 million in operational, commercial and corporate synergies. The Company expects to achieve the full run rate of these synergies within the first two years. The Company is confident in its ability to achieve these synergies given its solid track record of integrating operations and leveraging its integrated business model to deliver earnings growth through productivity, cost and system optimization benefits.

- **Strong Financial Position and Significant Cash Flow Enable Investments for Future Growth, Reducing Debt and Returning Cash to Shareholders:** The combined company is expected to deliver strong cash flows providing growth in shareholder value through investments in high-return capital projects, dividends and share repurchases. Upon closing, Tesoro will continue to have a strong balance sheet and credit metrics, and will remain on track for achieving an investment grade credit rating. The Company has increased its share repurchase authorization by $1.0 billion to over $2.0 billion in total. Tesoro expects to maintain its current quarterly dividend of $0.55 per share (or $2.20 per share annualized) after closing and is focused on growing dividends commensurate with the growth of the Company.

### Leadership

Upon closing, Greg Goff will continue to serve as Chairman, President and Chief Executive Officer of the combined company. Steven Sterin will continue to serve as Executive Vice President and Chief Financial Officer. Tesoro's Board of Directors is also expected to expand the size of the Board and name Western's current Executive Chairman, Paul Foster, and Western's current Chief Executive Officer, Jeff Stevens, as directors after closing of the transaction. The headquarters of Tesoro will remain in San Antonio, TX.

### Approvals and Timing

The transaction is expected to close in the first half of 2017 and is subject to customary closing conditions, including approval by the shareholders of both companies and the receipt of regulatory approval.

### Public Invitation to Conference Call and Webcast

Tesoro and Western will live broadcast a conference call at 7:30 a.m. CT (8:30 a.m. ET) today to discuss the transaction. Tesoro will also provide an update regarding its 2017 stand-alone outlook on the conference call. Interested parties

may listen to the conference call and access accompanying presentation slides by logging on to http://www.tsocorp.com or http://www.wnr.com.

**Advisors**

Goldman, Sachs & Co. is serving as exclusive financial advisor to Tesoro and certain of its affiliates are providing committed financing. Sullivan & Cromwell LLP is serving as Tesoro's legal advisor for the transaction. Barclays is serving as exclusive financial advisor to Western and Davis Polk & Wardwell LLP is serving as its legal advisor.

**D.    The Proposed Transaction Does Not Provide Adequate Value to Stockholders**

46.    As noted above, pursuant to the terms of the Merger Agreement, Western stockholders will receive $37.30, either in cash or in exchange for 0.4350 shares of Tesoro, for each share of Western stock owned.  Elections to receive cash will be subject to proration to the extent they exceed approximately 10.8 million shares (or approximately $404 million in the aggregate). Stock elections will not be subject to proration.

47.    As an initial matter, the Merger Consideration amounts to a 24.4% discount to the Company's 52-Week High trading price of $46.65 per share.  Further, the Merger Consideration only represents an 11% premium over the average analyst 12-month target price of $33.27.

48.    The Merger Consideration also fails to account for Western's acquisition of Northern Tier Energy LP.  As stated in a March 26, 2016 article on SeekingAlpha.com:

> Western will benefit from the acquisition of NTI. The merger will result in the combined entity owning three of the most profitable independent refineries on a gross margin per barrel basis, with direct pipeline access to advantaged crude oil combined with an integrated retail and wholesale distribution network. Considering its compelling valuation metrics WNR's stock, in my opinion, is extremely undervalued, its EV/EBITDA ratio is the second lowest among all Russell 1000 energy stocks. Moreover, the company is generating strong free cash flows and returns value to its shareholders by stock buyback and high-yielding dividend. The average target price of the top analysts is $40, up 36.4% from its March 21 close price, which appears reasonable, in my opinion.

49.    In a more recent SeekingAlpha.com article dated August 3, 2016, a commentator stated:

For me, the shares of WNR present an attractive trading opportunity. I see easy upside to $30 in the near term, offering a 50% return from the current share price. The $30 near-term price target is slightly below the midpoint of my estimate of the acceptable trading range for this company which accounts for the negative sentiment the company is experiencing at the present time. Over a longer period, I would expect shares to drift higher towards $40 in line with a mid-cycle P/E valuation and beyond that potentially higher to the $50 range once they have become fully valued.

**E.    The Merger Agreement Contains Onerous Deal Protection Devices**

50.    The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no successful competing offers will emerge for the Company.

51.    Despite the unfair price, the Merger Agreement has a number of provisions that make it more difficult for another buyer to purchase the Company, and for the Company to seek out competing offers.  Specifically, if the Company terminates the Proposed Transaction, the Merger Agreement states that the Company must pay Tesoro a $120 million termination fee.

52.    Additionally, the Merger Agreement contains a strict no-solicitation provision, pursuant to which the Company is prohibited from soliciting competing acquisition proposals or, subject to certain exceptions regarding unsolicited proposals, engaging in discussions or providing information in connection with an alternative acquisition proposal.  This clause prohibits the Company and its agents from soliciting, encouraging, or facilitating certain third party acquisition proposals for the Company.  The no-solicitation provision is particularly powerful here in light of Western's failure to conduct a pre-signing market check and failure to negotiate a post-signing go-shop period.

53.    The Merger Agreement also contains an information rights and matching rights provision that requires the Company to notify Tesoro of certain unsolicited competing offers,

provide Tesoro with information regarding such offers, and negotiate in good faith with Enbridge regarding same.  The Merger Agreement grants Tesoro recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four (4) business days to negotiate with Western to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

54.    These provisions will cumulatively discourage other potential bidders from making a competing bid for the Company.  Similarly, these provisions and the voting agreement make it more difficult for the Company and individual stockholders to exercise their rights and to obtain a fair price for the Company's shares.

**F.    The Incomplete and Materially Misleading Proxy Statement**

55.    On December 14, 2016, Western and Tesoro filed a joint S-4 Registration Statement (the "Proxy") with the SEC.  The Proxy provides Western's stockholders with the Board's recommendation that Western's stockholders vote in favor of the Proposed Transaction and is signed by one or more Defendant.

56.    The Proxy misrepresents and/or omits material information that is necessary to ensure the statements in the Proxy are not false and misleading so the Company's stockholders can make an informed decision regarding whether to tender their shares in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy fails to provide the Company's stockholders with material information concerning the Board's determination that no other alternative transaction was available to ensure the background of the merger in the Proxy is not false or misleading; and the financial analyses and work performed by Barclays necessary to ensure that the statement in the Proxy concerning Barclays' analyses and work are not false or misleading.  As a result of the incomplete and

misleading Proxy, the Company's stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

57.     First, the Proxy partially discloses that based upon discussions with Barclays, the Board determined that a superior alternative transaction was unlikely.   The Proxy fails to disclose why or how the Board came to this determination.   Because the Board determined not to conduct a pre- or post-signing market check, the information supporting the Board's determination is particularly material to Western's shareholders.   Without this information, the Proxy is rendered materially false or misleading because Western's shareholders are unable to determine whether the Board's opinion regarding potential alternative transactions was reasonable.

58.     Second, in conducting its Discounted Cash Flow Analysis, Barclays used Western's after-tax unlevered free cash flows ("Free Cash Flows") for years 2017 through 2021. The Proxy defines Free Cash Flows "as consolidated net income plus depreciation and amortization and tax-adjusted interest expense, less capital expenditures and adjusted for other non-cash items."  As such, Free Cash Flows is a non-GAAP financial measure and it is common for Companies to treat non-cash items differently in calculating non-GAAP financial measures. The specific non-cash items used to adjust the Free Cash Flows in Barclays' discounted cash flow analysis are particularly material to Western's stockholders because without it, stockholders are unable to determine how non-cash items, like stock based compensation for instance, were treated in calculating Western's Free Cash Flows rendering the Proxy materially misleading. The materiality of the non-cash items is compounded by the fact that Goldman Sachs conducted its analysis using unlevered free cash flows directly from Western's financial statements.  By specifically disclosing that Barclays' Free Cash Flows figures were adjusted for certain "non-

cash items," the Proxy only partially discloses at least two definitions of cash flows used leaving Western shareholders unaware of the differences between the analyses conducted by Goldman Sachs and Barclays. Stockholders are entitled to know the specific "non-cash items" used to adjust the Free Cash Flows.

59. Third, the Proxy fails to disclose the company specific EBITDA multiples used in its *Selected Comparable Company Analysis*. Nor does the Proxy disclose the median or average EBITDA multiple of the selected companies. The omission of this information renders the Proxy materially misleading because Western's stockholders are unable to determine how the multiples used in determining Western's value compare to the other transactions. Western's stockholders are entitled to this information in order to determine Western's true value.

60. Fourth, the Proxy fails to disclose certain material information regarding Barclays' *Selected Precedent Transactions Analysis*. More specifically, the Proxy fails to disclose specific, a mean, or a median EBITDA multiple for the selected transactions. This information is material to Western's stockholders for the same reasons the information is material in the *Selected Comparable Company Analysis*. Additionally, this information is particularly material in light of the fact that six of the ten transactions considered are more than ten years old. Moreover, the Proxy fails to disclose why Barclays used these older transactions. Without this information, the Proxy is misleading, and Western's stockholders are entitled to this information before being asked to vote in favor the Proposed Transaction.

61. Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and due care owed to Plaintiff and other public stockholders of Western.

**CLAIMS FOR RELIEF**

**COUNT I**

**Against Western and the Director Defendants for**
**Violations of Section 14(a) of the Securities Exchange Act of 1934**

62.     Plaintiff incorporates by reference and realleges each and every allegation

contained above as though fully set forth herein.

63.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of

the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any
> proxy statement, form of proxy, notice of meeting or other communication,
> written or oral, containing any statement which, at the time and in light of
> the circumstances under which it is made, is false or misleading with
> respect to any material fact, or which omits to state any material fact
> necessary in order to make the statements therein not false or misleading or
> necessary to correct any statement in any earlier communication with
> respect to the solicitation of a proxy for the same meeting or subject matter
> which has become false or misleading.

64.     During the relevant period, Defendants disseminated the false and misleading

Proxy specified above, which failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading in

violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

65.     By virtue of their positions within the Company, the Director Defendants were

aware of this information and of their duty to disclose this information in the Proxy.  The Proxy

was prepared, reviewed, and/or disseminated by the Director Defendants.   The Proxy

misrepresented and/or omitted material facts, including material information about the unfair sale

process for the Company, the unfair consideration offered in the Proposed Transaction, and the

actual intrinsic value of the Company's assets.  Defendants were at least negligent in filing the

Proxy with these materially false and misleading statements.  Defendants have also failed to

correct the Proxy and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

66.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

67.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

68.     Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

69.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## COUNT II

### Against the Director Defendants for
### Violations of Section 20(a) of the Securities Exchange Act of 1934

70.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

71.     The Director Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with

the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

72.     Each of the Director Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each of the Director Defendants is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Director Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

74.     In addition, as the Proxy sets forth at length, and as described herein, the Director Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions that had input from the Director Defendants.

75.     By virtue of the foregoing, the Director Defendants have violated Section 20(a) of the Exchange Act.

76.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      In the event that Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  January 5, 2017.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____

Thomas E. Bilek
Texas Bar No. 02313525
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

tbilek@bileklaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

Nadeem Faruqi
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Fl.
New York, NY  10017
Tel.: (212) 983-9330